UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MATKIN-HOOVER ENGINEERING, INC., | § | |
| JOHN MATKIN, P.E., and | § | |
| JEFF CARROLL, P.E., | § | |
| | § | CIVIL ACTION NO. |
| Plaintiffs, | § | |
| v. | § | SA-08-CV-0451 FB (NN) |
| | § | |
| EVEREST NATIONAL INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

TO:  Honorable Fred Biery
     United States District Judge

    This report and recommendation addresses three pending motions: (1) the motion for summary judgment filed by defendant Everest National Insurance Company (Everest);[1] (2) the motion for partial summary judgment filed by plaintiffs Matkin-Hoover Engineering, Inc.; John Matkin; and Jeff Carroll (together, Matkin-Hoover);[2] and Everest's motion to strike Carroll's affidavit.[3] I have authority to issue this report and recommendation pursuant to the district court's order of referral.[4]

    This case involves a dispute between an insurer—Everest—and its insured—Matkin-Hoover, an engineering firm. The dispute is whether Everest has a duty to defend Matkin-Hoover

---

[1]Docket entry # 19.

[2]Docket entry # 20.

[3]Docket entry # 26.

[4]Docket entry # 37.

in a state-court lawsuit. In the underlying lawsuit, GEWAC, Inc., sued Matkin-Hoover, an architectural firm, and a construction contractor in connection with the design and construction of the Marbach Square shopping center and parking lot. The design/construction problem is improper drainage of the parking lot. Everest refused to defend Matkin-Hoover in the state-court lawsuit. Matkin-Hoover filed this lawsuit, asking the court to declare that Everest has a duty to defend it in the state-court lawsuit.[5]

Matkin-Hoover succinctly stated the summary-judgment issue in its reply to Everett's response to its motion for partial summary judgment:

> The parties agree that central to determination of this dispute, and the issue presented in Everest's *and* Matkin-Hoover's Motions for Summary Judgment, is determination whether a letter written by the third party, GEWAC, to Matkin-Hoover, dated March 19, 2006, ("the GEWAC letter") constituted a "claim" as that term is defined in Everest's insurance policy.[6]

The other issue presented by the pending motions is whether to exclude Carroll's affidavit. Matkin-Hoover provided the affidavit with its response to Everest's motion for summary judgment. The court can resolve the summary-judgment issue without the affidavit.

There are two insurance policies that obligated Everest to defend Matkin-Hoover against a covered claim: one covered the time period from April 15, 2005 to April 15, 2006 (the 2005 policy), and one covered the time period from April 15, 2006 to April 15, 2007 (the 2006 policy).[7] To trigger coverage under the policies, "the **claim** arising out of the **wrongful act** is first made against any Insured during the **policy period**" and "the **claim** is reported in writing to

---

[5]*See* docket entry # 1, exh. A.

[6]Docket entry # 31, pp. 1-2.

[7]The policies are attached to both summary-judgment motions.

[Everest] no later than 60 days after the end of the **policy period**. . . ."[8]—that is, the claim must be first made and reported within the same policy period.

Everest characterizes the GEWAC letter as a demand letter constituting a claim and maintains that Matkin-Hoover did not give timely notice of the claim under the 2005 policy.[9] The GEWAC letter was written during the 2005 policy period; Matkin-Hoover gave Everest notice on August 30, 2006,[10] during the 2006 policy period. Under Everest's version, notice was untimely and Everest has no duty to defend Matkin-Hoover. In contrast, Matkin-Hoover characterizes the GEWAC letter as a request for additional engineering services to fix construction defects in the parking lot.[11] Matkin-Hoover maintains GEWAC did not clearly indicate that GEWAC expected Matkin-Hoover to pay to fix the defects in the Marbach Square parking lot until May 19, 2006, during the 2006 policy period.[12] Matkin-Hoover notified Everest of the May 19, 2006 demand on August 30, 2006, during the 2006 policy period. Under Matkin-Hoover's version, notice was timely and Everest has a duty to defend Matkin-Hoover.

> The parties . . . agree that to determine [whether the GEWAC letter constituted a claim], this Court must engage in a two-fold analysis. First, the Court must determine the meaning of the term "claim" as it is defined in the subject insurance policy.[sic] or if that definition is ambiguous. Second, the Court must determine whether the GEWAC letter fits the policy's definition of "claim."[13]

---

[8]Policies, § I.B.

[9]Docket entry # 19, pp. 2-3.

[10]Docket entry # 20, exh. K.

[11]Docket entry # 24, p. 2.

[12]*Id*. at p. 3.

[13]Docket entry # 31, pp. 1-2.

The policies define "claim" as follows:

> **"Claim"** means a demand for money or **professional services** received by the Insured for **damages,** including but not limited to, the service of a lawsuit or the institution of arbitration proceedings or other alternative dispute resolution proceedings, alleging a **wrongful act** arising out of the performance of **professional services**.[14]

The parties disagree about whether this definition is ambiguous. Everest maintains the definition is unambiguous[15]—Matkin-Hoover maintains the definition contains a latent ambiguity.[16] "An ambiguity does not arise, however, merely because the parties advance conflicting contract interpretations."[17]

"If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous."[18]

> An ambiguity in a contract may be said to be "patent" or "latent." A patent ambiguity is evident on the face of the contract. A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter.[19]

---

[14]Policies, § IV.C.

[15]Docket entry # 23, p. 3.

[16]Docket entry # 20, p. 14.

[17]*Kelley-Coppedge v. Highlands Ins. Co.*, 980 S.W.2d 462, 465 (Tex. 1998). *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994) ("[N]ot every difference in the interpretation of a contract or an insurance policy amounts to an ambiguity. Both the insured and the insurer are likely to take conflicting views of coverage, but neither conflicting expectations nor disputation is sufficient to create an ambiguity.").

[18]*Bituminous Cas. Corp. v. Maxey*, 110 S.W.3d 203, 209 (Tex. App.—Houston [1 Dist.] 2003) (citations omitted).

[19]*Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995) (citations omitted).

4

"The interpretation of an unambiguous contract is a question of law for the court."[20]

Matkin-Hoover maintains the definition contains a latent ambiguity with regard to communications that do not arise to the level of formal proceedings. But there's nothing ambiguous about the definition. The definition anticipates that communications other than "the service of a lawsuit or the institution of arbitration proceedings or other alternative dispute resolution proceedings"—whether formal or informal—may implicate the duty to defend by using the words "demand" and "including but limited to." Matkin-Hoover's understanding that an informal demand could implicate the requirement to notify Everest of a claim is evidenced by its action upon receipt of the May 19, 2006 email from GEWAC's president—the author of the GEWAC letter. In the email, GEWAC stated that "you have refused to accept responsibility for your design error. . . ."[21] Matkin-Hoover interpreted the email as notice that GEWAC expected it to pay for the repair of the parking lot and notified its attorney. The absence of words stating that the definition of "claim" applies to informal proceedings isn't the type of latent ambiguity recognized by courts.[22] Under the definition, whether a claim has been made on an insured doesn't depend on whether a demand is formal or informal—it depends on whether the communication "demand[s] . . . money or professional services . . . for **damages**. . . [and] alleg[es] a **wrongful act** arising out of the performance of **professional services**." The definition is not ambiguous.

---

[20]*Maxey*, 110 S.W.3d at 209.

[21]Docket entry # 20, exh. J.

[22]*See Nat'l Union Fire Ins. Co. of Pittsburgh*, 907 S.W.2d at 520 n. 4 (explaining latent ambiguity by using the example of a contract calling for goods to be delivered to "the green house on Pecan Street" and there were two green houses on the street).

That determined, the next question is whether the GEWAC letter fits the policy's definition of "claim." "[W]hether a given demand is a 'claim' within the meaning of a claims made policy requires a fact-specific analysis to be conducted on a case-by-case basis."[23] The inquiry asks "asks when circumstances known to the insured would have suggested to reasonable person the possibility of claim."[24] Asking that question here results in a question of fact—whether a reasonable person would have interpreted the GEWAC letter as a demand for professional services for damages.

Everest contends that the GEWAC letter "unequivocally placed the blame for the Marbach Square's drainage problem on the grading plan created by Matkin-Hoover."[25] It insists that "the only reasonable interpretation of that letter is that it constitutes a 'claim' as the term is defined under the Policies because (1) it demands Matkin-Hoover perform 'professional services' to repair the drainage problems—namely, the preparation of revised drainage plans for the property in Matkin-Hoover's capacity as a civil engineer; and (2) it alleges that Matkin-Hoover committed a 'wrongful act' that arose out of the performance of a professional service—*i.e.*, that the initial drainage plans prepared by Matkin-Hoover in its capacity as civil engineer did not comply with appropriate standards to ensure proper drainage on the property."[26] But that characterization is over-stated. Considering the circumstances known to the insured, the letter did not necessarily suggest to a reasonable person the possibility of claim.

---

[23]*F.D.I.C. v. Mijali*s, 15 F.3d 1314, 1331 (5th Cir. 1994).

[24]*Blanton v. Vesta Lloyds Ins. Co.*, 185 S.W.3d 607, 614 (Tex. App.—Dallas 2006, no pet.) (quoting *Couch on Insurance*).

[25]Docket entry # 19, ¶ 30.

[26]*Id.* at ¶ 35.

The summary-judgment evidence shows that Matkin-Hoover was aware of drainage problems by January 29, 2006 when the Marbach Square architect forwarded an email from the GEWAC president. The email stated that "Marbach Square parking lot does not drain properly and has actually gotten worse since the last repairs. . . . I regret that I have to keep inviting you back to deal with this problem. . . . [T]here could be a civil-engineering design issue here. Please get the civil engineer to evaluate the situation to determine what really is the problem and how to best solve it."[27] Matkin-Hoover responded to the request for an evaluation and reported its evaluation to GEWAC by letter on February 13, 2006.[28] Matkin-Hoover reported that "a geotechnical firm[] conducted pavement core samples at three locations of the main drive aisle of the site to determine the status of the pavement" and explained that the "pavement section as built is not adequate to handle the daily car and bus traffic that the site receives." Matkin-Hoover recommended that "[t]he contractor . . . rebuild the drive aisle and parking lots with the correct pavement section and grades as shown on the civil plans. This pavement repair should be at the contractor's expense as the pavement was not built per the plans."

The GEWAC letter responded to Matkin-Hoover's February 13, 2006 letter. The letter reported that the general contractor for Marbach Square had a drilling test performed on the pavement on March 16, 2006 and assessed the pavement as "structurally sound" and showing no "indication of distress or excessive settlement."[29] The letter continued to state that Matkin-Hoover's design "provided a .0525 percent slope instead of at least two (2) percent slope as

---

[27]Docket entry # 24, exh. 1.

[28]*Id*., exh. 2.

[29]*Id*., exh. 3.

7

recommended by the geotechnical report. That is the reason the parking lot is not draining." The letter concluded with: "You need to develop a plan to correct the drainage problem. Your plan has to include an engineering design and a provision for adequate funds to finance the construction. Please provide such a plan to us by the close of business on April 10, 2006." Although Everest maintains that the letter clearly indicated that GEWAC expected Matkin-Hoover to pay for the repair of the parking lot, neither the letter's language nor the communications that followed make it clear that GEWAC held Matkin-Hoover responsible for the problem or expected Matkin-Hoover to pay to fix the problem.

Matkin-Hoover responded by letter on April 10, 2006. Matkin-Hoover reiterated that "in all sample locations the pavement section was not per the construction plans and geotechnical report."[30] The letter explained that "[a]lthough [the 0.525%] slope [called for by the civil engineering plans] is less than the recommended slope by the "Asphalt Institute of America", this slope is common engineering practice and the slope exceeds the minimum slope of 0.050% as required by the San Antonio Unified Development Code. . . . Th[e] as-built pavement slope is less than the construction documents and therefore is inadequate." Matkin-Hoover stated, "this pavement repair should be at the contractor's expense as the parking lots pavement section and slope were not built per the construction documents," and requested "a meeting between the Owner and Architect as soon as possible to discuss possible alterations to the grading in these areas to minimize the possibility of ponding of water."

The summary-judgment evidence indicates a follow-up meeting was conducted on April 25, 2006. Matkin-Hoover referred to the meeting in a May 18, 2006 letter addressed to

---

[30]*Id.*, exh. 4.

GEWAC.[31] In the letter, Matkin-Hoover reported the results of "a comprehensive as-built survey" discussed at the April 25th meeting and proposed a plan to address GEWAC's concerns. Matkin-Hoover explained how Marbach Road underwent construction during construction of Marbach Square and the grade of the road changed. It discussed how "the concrete pavement was built 6 inches higher than per the plans (4 inches higher that the revision required by the change to Marbach)" and how the 6 inch elevation of the concrete "decreased the slope from 0.525% per the plans to **an as-built condition of 0.21%** across the front of the building." Matkin-Hoover suggested that "the areas that were built without adequate slope be removed and replaced with concrete and that a concrete valley gutter with a minimum slope of 0.40% be built to better carry the water." GEWAC responded to this letter by email on May 19, 2006 with the following:

> My reading of your letter dated May 18, 2006 is that you have refused to accept responsibility for your design error. You designed a building at a very low elevation next to a street that does not have a subsurface drainage system. Your letter contains suggestions to correct the problem but you did not discuss the costs, any attempt to determine the costs, or how to pay for the costs. You simply dumped your suggestions on my laps [sic], which I interpret to mean that you have refused to accept responsibility for your design error. Do I read you correctly?[32]

Until the point of this email, a reasonable person could have believed that GEWAC had not decided who caused the drainage problem. But the email made it clear that GEWAC then considered Matkin-Hoover's design to have caused the problem. I agree with Matkin-Hoover's position that the March 19, 2006 GEWAC letter "could be reasonably regarded not as a demand but as a request for additional engineering services to help correct a construction defect for which

---

[31]*Id.*, exh. 5.

[32]Docket entry # 20, exh. J.

9

Matkin-Hoover was not responsible and for which it thought, at that time, it would be paid."[33] Ultimately, GEWAC sued everyone involved in the Marbach Square project—the architect, Matkin-Hoover, and the contractor—suggesting GEWAC is uncertain about who caused the problem. Everest correctly argues that the letter demanded professional services, but the letter did not demand professional services for damages as the definition of "claim" requires. The policies define "damages" as "any amount which an insured is legally obligated to pay for any covered **claim,** including judgments, awards or settlements entered into with our prior knowledge and consent." The GEWAC letter does not suggest that GEWAC expected Matkin-Hoover to pay an amount which Matkin-Hoover was legally obligated to pay for a covered claim. A reasonable person may likely have viewed the GEWAC letter as Matkin-Hoover says it did—as a request for additional engineering services to fix the drainage problem for which it would be paid. Because a reasonable person may not have viewed the letter as a demand for professional services for damages, a question of fact exists, precluding summary judgment.

**Recommendation**. I recommend denying both summary-judgment motions (docket entry #s 19 & 20. If the district judge agrees with this recommendation, the motion to strike Carroll's affidavit (docket entry # 26) can be denied as moot.

### Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "Filing User" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this report and recommendation must be

---

[33]Docket entry # 20, p. 3.

filed within 10 days after being served with a copy of same, unless this time period is modified by the district court.[34] Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the magistrate judge. A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections. A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court.[35] Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.[36]

**SIGNED** on May 23, 2009.

*NANCY STEIN NOWAK*
NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[34] 28 U.S.C. §636(b)(1); FED. R. CIV. P. 72(b).

[35] *Thomas v. Arn*, 474 U.S. 140, 149-152 (1985); *Acuña v. Brown & Root*, 200 F.3d 335, 340 (5th Cir. 2000).

[36] *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).